**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**INSPIRED CAPITAL, LLC**, and **ERICA GARY**, derivatively on behalf of INSPIRED FOOD SOLUTIONS, LLC,

                Plaintiffs,

    vs.

**CONDE NAST**, an unincorporated division of Advance Magazine Publishers, Inc., and **FREMANTLEMEDIA NORTH AMERICA**, **INC**., a foreign corporation

Case No:

**COMPLAINT AND JURY DEMAND**

---

## COMPLAINT

Plaintiffs Inspired Capital, LLC ("Inspired") and Erica Gary ("Erica Gary"), derivatively on behalf of Inspired Food Solutions, LLC ("IFS") (Inspired, Erica Gary and IFS will be collectively referred to as "Plaintiffs"), through undersigned counsel, sues Defendants Conde Nast and FremantleMedia North America, Inc. ("Fremantle") (collectively "Defendants"), and alleges:

## SUMMARY OF ACTION

1.    This matter is about the Defendants' lust to deprive Inspired and IFS of the benefits of intellectual property IFS developed with the resources Inspired invested in IFS.

2.    More specifically, Inspired infused $500,000.00 into IFS, which Calvin Harris ("Harris"), IFS's CEO and chef, used to develop a line of frozen healthy food recipes and food products, that with other items became the confidential, proprietary and trade secrets of IFS ("IFS Intellectual Property").  After spending several months developing the food recipes and

food products and with less than 30 days before the scheduled sales launch of the food products, Harris and Steven Howell ("Howell"), an outsider of IFS, created a new Florida entity, Benevida Foods, LLC ("Benevida"), into which they roguishly transferred the IFS Intellectual Property, including the food recipes.

3.      With less than 30 days before the scheduled sales launch of the food products, Benevida, Howell, and Harris conspired with Conde Nast and Fremantle to, among other things, start and continue selling the food products in over five thousand (5,000) grocery stores nationwide and to continue misappropriating the IFS Intellectual Property.

4.      Remarkably, Conde Nast and Freemantle knew that Benevida, Howell and Harris stole and were improperly using the IFS Intellectual Property.  Rather than distance themselves from Benevida, Howell and Harris, Conde Nast and Fremantle joined the scheme to deprive IFS, Inspired and Gary of the benefits of the IFS Intellectual Property.

## PARTIES, JURISDICTION AND VENUE

5.      Inspired Food Solutions, LLC ("IFS") is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.  All of the members of IFS are domiciled in Broward County, Florida.

6.      Inspired Capital, LLC ("Inspired") is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.  Inspired, a member of IFS, has two managing member designees on IFS's management committee.  The members of Inspired are Issa Gary ("Issa") and Demetrius Walton ("Walton"), both over the age of eighteen and domiciled in Broward County, Florida.

7.      Erica Gary ("Gary") is over the age of eighteen (18), is *sui juris*, and is domiciled

in Broward County, Florida.  Gary is the remaining member of IFS.

8.     Conde Nast is an unincorporated division of Advance Magazine Publishers, Inc., a New York Corporation that has its principal place of business in New York, New York and is authorized to and doing business in New York, New York.

9.     FremantleMedia North America, Inc. ("Fremantle") is a Delaware corporation, has it principal place of business in California and is authorized to and doing business in New York.

10.     Subject matter jurisdiction in this Court is proper pursuant to section 28 U.S.C. § 1332(a) because there is diversity of citizenship between Plaintiffs and Defendants and the matter is for monetary damages in excess of $75,000.00, exclusive of interest, costs and attorney's fees.

11.     The Court has personal jurisdiction over Defendant Conde Nast because it regularly transacts business in New York and the some of the conduct which gives rise to Plaintiffs' claims occurred in New York.  The Court also has personal jurisdiction over Conde Nast because it has consented to the exclusive jurisdiction of this forum via an agreement with IFS.

12.     The Court has personal jurisdiction over Defendant Fremantle because it regularly transacts business in New York, some of the conduct which gives rise to Plaintiffs' claims occurred in New York and Fremantle has consented to the exclusive jurisdiction of this forum via an agreement with IFS.

13.     Venue in this Court is proper pursuant to section 28 U.S.C. 1391(b)(1), because the Defendants are residents of New York, and have consented to personal jurisdiction and venue

3

in this Court.

14.     Plaintiffs have complied with all conditions precedent to pursuing this action or said conditions have been waived or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A.     THE FORMATION OF AND INITIAL CASH INFUSION INTO IFS

15.     Calvin Harris ("Harris"), who is a chef, formed IFS in 2012.  Harris, however, lacked the capital to fund IFS, which was created to develop, manufacture and distribute lifestyle food brands and products.

16.     In early 2013, Harris hired Gary and a company called Davis Gary Trusted Advisors as consultants to help IFS raise capital from investors, including from Issa Gary ("Issa") and Demetrius Walton ("Walton"), who Gary introduced to Harris.

17.     During his presentation and discussions with Issa and Walton, Harris explained IFS's business model, financial overview and projections and its desire to develop a line of frozen food entrees that would be owned by IFS, but marketed and promoted by Fremantle and Conde Nast under Conde Nast's SELF Brand.

18.     Based on Harris's presentation and discussions, Issa and Walton decided to invest in IFS and formed Inspired to acquire an interest in IFS.

19.     Relying on and trusting Harris's representations, on or about March 2013, Inspired and Harris on behalf of IFS entered into a Memorandum of Understanding ("MOU"), which outlines terms and conditions pursuant to which Inspired would acquire an interest in IFS.

20.     Pursuant to the terms of the MOU, Inspired infused an initial $100,000.00 of working capital into IFS, which was to be used to secure a marketing and promotion agreement

with Conde Nast and Fremantle, Conde Nast's authorized representative, pursuant to which Conde Nast and Fremantle, in return for royalty payments from IFS, would market and promote the food entrees developed and owned by IFS under the SELF Brand using the name SELF Healthy Kitchen.

## B.   THE OPERATING AGREEMENT OF AND ADDITIONAL CASH INFUSION INTO IFS

21.     On or about May 7, 2013, Inspired, Harris and Gary entered into a Florida Limited Liability Company Agreement of Inspired Food Solutions, LLC ("Operating Agreement"), a copy of which is attached as **Exhibit A**.

22.     Pursuant to the Operating Agreement, Inspired made a capital contribution to IFS of $500,000.00, which included the previously contributed $100,000.00.  In return, Inspired received, among other things, a 15% interest in IFS and the right to quarterly royalty and other payments, including a lump sum payment of $1,500,000.00 on or before December 31, 2018.

23.     Harris, who did not make a capital contribution, retained 84% of IFS and Gary received the remaining 1%.  Harris subsequently relinquished his interest in IFS.

24.     Article VI of the Operating Agreement provides that IFS shall be managed by a management committee, which was made up of two designees of Inspired (Issa and Walton) and Harris and that "any decision required to be made by the Management Committee shall only be valid upon the vote of a Majority of the Management Committee."

25.     Article VI further provides that "[a]ny deadlock of the Management Committee unable to be mediated shall be resolved through binding arbitration" and that the CEO, who at all relevant times was Harris, "subject to the oversight of the Management Committee, shall

supervise and control the day-to-day business and affairs of [IFS]."

26.     Importantly, Article VI also provides that, among other things, IFS may not be dissolved, liquidated, sold, merged, or reorganized without the prior approval of the two designees of Inspired and Harris.

27.     Article XV of the Operating Agreement provides that IFS may be dissolved and its affairs wound up *only* (1) if there are no Members, or (2) upon a judicial order of dissolution.

28.     Article XVI of the Operating Agreement defines what constitutes the Confidential Information of IFS.  The definition includes, *inter alia*, the IFS Intellectual Property, information concerning the past, current and planned business, products, strategy, operations and affairs of IFS, trade secrets, products, know-how, inventions and ideas, product ideas and formulation of IFS (collectively the "Confidential Information").

29.     Article XVI further provides that members shall not disclose the Confidential Information to any person without the specific prior *written* consent of IFS.

**C.    THE DEVELOPMENT AND MARKETING OF THE FOOD PRODUCTS AND CONDE NAST'S AND FREMANTLE'S KNOWLEDGE THAT THE FOOD PRODUCTS WERE THE PROPERTY OF IFS**

30.     After executing the Operating Agreement, Harris began developing for IFS food recipes.  He spent approximately 8 months developing, testing and refining the recipes and working to obtain the necessary approvals from the U.S. Department of Agricultural ("USDA") to sell the food products developed with the recipes.

31.     After executing the Operating Agreement, on March 15, 2013, Harris executed a Binding Merchandising Deal Memo ("Deal Memo") with Conde Nast and Fremantle, which outlined the terms pursuant to which the Conde Nast would grant a license to IFS to use Conde

Nast's SELF trademark to produce, distribute, promote and sell its food products..  A copy of the Deal Memo is attached as **Exhibit B**.

32.     In May 2013, IFS, Conde Nast and Fremantle executed a License Agreement ("IFS License Agreement"), which adopted terms outlined in the Deal Memo.  A copy of the IFS License Agreement is attached as **Exhibit C.**

33.     Summarily, as they agreed to do in the Deal Memo, Conde Nast and Fremantle, pursuant to the IFS License Agreement, agreed to market the IFS food products under Conde Nast's SELF trademark and to provide $2 million dollars of marketing support to IFS during the first term of the IFS License Agreement.  In return, IFS agreed to pay Conde Nast and Fremantle royalties over the term of the IFS License Agreement.

34.     Also, consistent with the terms of the Deal Memo, the IFS License Agreement established a confidential relationship between the parties thereto, *i.e.* IFS, Conde Nast, Fremantle and their representatives.  More specifically, IFS, Conde Nast and Fremantle agreed to keep confidential and to not use or disclose, except as provided in the IFS License Agreement, the Confidential Information, including the IFS Intellectual Property, during and after the expiration of the IFS License Agreement.

35.     After executing the Deal Memo and the IFS License Agreement, Conde Nast and Fremantle continued working with IFS, including attending taste tests, as IFS developed its food recipes.

36.     Simply, Conde Nast and Fremantle were fully aware of what IFS was doing during the development process and knew the recipes and food products belonged exclusively to IFS long before the January 2014 sales launch of the food products.

37.     As a matter of fact, Conde Nast and Fremantle were instrumental in preparing the public relations and marketing plans for the January 2014 sales launch of the food products.

38.     For example, on November 21, 2013, Conde Nast and Fremantle prepared the public relations launch plan and a press release for the January 21, 2014 sales launch, which state, *inter alia*, that Conde Nast will introduce SELF Healthy Kitchen, a new line of frozen meals that were developed and owned by Inspired Food Solutions (collectively the "Press Kit"). A copy of the Press Kit is attached as **Exhibit D**.

39.     Additionally, Conde Nast and Fremantle prepared and revised the Harris biography that would be used to promote the food products, which biography states, in part, that "SELF Healthy Kitchen is the first product to be ***developed, marketed and distributed by IFS***." (Emphasis added).  A copy of the bio is attached as **Exhibit E.**

**D.     THE BIRTH OF THE FRAUDULENT SCHEME TO OUST INSPIRED AND GARY FROM IFS**

40.     Five days after Conde Nast and Fremantle prepared the Press Kit, Harris concocted a scheme to oust Inspired and Gary as members of IFS so that only Harris and his co-conspirators, Howell, Benevida, Conde Nast and Fremantle, and not Inspired and Gary, would reap the economic benefits of IFS's food recipes, the food products developed with the recipes and other IFS's Intellectual Property and Confidential Information.

41.     On or about November 26, 2013, Harris contacted and informed Howell of a "new amazing investment opportunity" relating to new frozen food products that IFS developed and was preparing to sell in January 2014 in over 4,000 grocery stores.

42.     Shortly thereafter and continuing into December 2013, Harris and Howell began

discussing ways to oust Inspired and Gary from IFS, including the type of offer Howell could

make to Inspired and Gary, and how to pressure Inspired and Gary to accept Howell's offer.

43.     For example, before December 28, 2013, Harris and Howell agreed on the offer

Howell would make to purchase Inspired's and Gary's interest in IFS.  In particular, Howell

would simply return without interest Inspired's initial investment of $500,000.00 and offer

Inspired and Gary so-called options to purchase at 50% above market price stock in IFS if it

became a publicly traded company ("Howell's Buy-Out Offer").

44.     To pressure Inspired and Gary to accept Howell's Buy-Out Offer and before

disclosing the offer, Howell and Harris devised a plan to claim that IFS was insolvent so that

Harris could present Howell as the knight in shining armor that would save IFS from insolvency.

45.     In furtherance of the plan, on Saturday, December 28, 2013, Howell wrote the

following email ("Howell Email") Harris would pretend he wrote and send to Inspired and Gary:

> As we previously discussed, we missed payroll for this last pay period.
> Given this fact and as you know from our financials and current liabilities,
> the company does not have the operating capital necessary to continue.
>
> Without a large infusion of new capital, this company will have no choice
> but to shut down.  From our previous conversations, I don't believe you
> are willing to put in the funds needed to not only fully support this
> operation, but also cover the pending payment of $250,000.00 already
> overdue to Conde Nast.
>
> I do have an investor with an offer that I would like to discuss on Sunday
> or Monday.  Assuming you accept, this will allow the company to
> continue.

46.     Prior and contrary to the Howell Email, Inspired and Gary had secured additional

financing for IFS, which Harris had agreed to.  Additionally, IFS obtained an extension of time

to pay Conde Nast the $250,000.00 marketing and promotion fee referenced in the Howell

9

Email, which amount was less than the additional financing Inspired and Gary had secured for IFS.

47.     Thus, Harris needed a way to undo his prior agreement to the additional financing secured by IFS before sending the Howell Email.  He sought the help of his friend, Darryl Taja, with this aspect of the scheme.

48.     On December 29, 2013, Taja wrote the following email ("Taja Email") Harris would pretend he wrote and send to Inspired and Gary so that Harris could back out of the additional financing secured for IFS.  The email states:

> **_Be careful with email.  It can be used in a lawsuit.  I would write something like this –_**
>
> "Although, you gave me no time to seek advice from legal counsel and tried to pressure me to sign an agreement under duress, ultimately, I did speak with legal counsel.  As a result, after discussing with legal counsel and other business advisors, I have become very uncomfortable with being forced into signing an agreement or agreeing to a proposal such as yours. Consequently, I'd like to present and discuss a counter-proposal, in person.  If a meeting can not (sic) take place or you are not interested in discussing further in person, please let me know as soon as possible and I will proceed accordingly.  Thank you, Calvin Harris."
>
> Keep it simple, professional and direct.  I'm still on the road driving.  We are struck in (virtually) stand-still traffic, which is why I can write this email.  Hopefully, we will be in the hotel in the next 2 hours if you want to discuss.  (Emphasis added)

49.     On Sunday December 29, 2013, Howell emailed Harris the Howell Buy-Out Offer, which expired the next day (December 30) at 5 pm.  Harris did not immediately forward the offer to Inspired or Gary.  Instead, he forwarded it to Taja for his review.

50.     On Sunday December 29, 2013, and as planned, Harris copied the Howell Email to make it look as if he wrote it and sent it to Inspired and Gary.  After receiving a response from

Issa, Harris copied the Taja Email to make it look as if he wrote it and sent it to Inspired and Gary.

51.     On Monday December 30, 2013, Harris forwarded Howell's Buy-Out Offer to Inspired and Gary.

52.     This was the first time Inspired and Gary learned that Howell was the investor referenced in the Howell Email and that Howell wanted to buy their interest in IFS, which they had not previously offered to sell.

53.     On Wednesday January 1, 2014, Inspired and Gary made a counter offer to Howell's Buy-Out Offer, which was rejected by Howell on January 2, 2014.

## E.     THE PLAN TO CREATE BENEVIDA, A NEW ENTITY, AND STEAL IFS'S INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION AND EMPLOYEES

54.     Angered that they were not able to force Inspired and Gary to accept the ridiculous Howell Buy-Out Offer, Harris and Howell decided they would steal IFS's Intellectual Property, Confidential Information, and employees and continue doing business as usual with Conde Nast and Fremantle.

55.     In furtherance of the plan, on January 3, 2014, and contrary to the Operating Agreement, Harris emailed Inspired and Gary to tell them that IFS was insolvent, as he was instructed to do by Howell, and was dissolved effective immediately ("Dissolution Email"), which claim was immediately rejected by Inspired and Gary.

56.     Unbeknownst to Inspired and Gary, on or about January 6, 2014, Harris and Howell formed Benevida.  Harris owns 51% of Benevida and Howell owns 49%.

57.     Also unbeknownst to Inspired and Gary at the time of the Dissolution Email,

Harris and the other IFS employees who were planning to leave IFS to join Benevida, continued preparing for the January 2014 launch of the IFS food products, including coordinating with suppliers and distributors about the design of the food packaging and logistics for the delivery of the food products to the groceries and other stores.

## F.   CONDE NAST'S AND FREMANTLE'S DECISION TO PARTICIPATE IN THE HARRIS AND HOWELL FRAUDULENT PLAN

58.     Harris and Howell, however, knew their plan would fail without the support and assistance of Conde Nast and Fremantle.

59.     Thus, on or before January 7, 2014, Harris contacted John Kulhawik ("Kulhawik"), Conde Nast's Vice President, and Andrea Brent ("Brent"), Fremantle's Vice President of Consumer Products, to get their support and assistance for the plan.

60.     In his email to Kulhawik initiating their phone call, Harris tells Kulhawik to "Please call me ASAP, *I have some exciting news* that I want to share with you."

61.     Kulhawik scheduled the call with Harris, Brent and another Conde Nast employee for 1 pm on January 7, 2014.

62.     During the January 7 call with Kulhawik, Brent and the other Conde Nast employee, Harris shared his "exciting news".  Specifically, Harris told Kulhawik and Brent that he and Howell had formed Benevida on or about January 7, 2014, to do the very thing that IFS had set out to do -- distribute via the SELF brand the food products and food recipes developed with the money Plaintiffs infused into IFS -- and asked them if Conde Nast and Fremantle would market and promote the sale of the IFS food products via Benevida instead of via IFS.

63.     Kulhawik and Brent knew that IFS and not Benevida owned the IFS food recipes

and food products and that Benevida did not have the rights to use the IFS food recipes and to sell the IFS food products.

64.     Remarkably, rather than reject Harris's and Howell's plan as brazen thievery, Conde Nast and Fremantle agreed to help Harris and Howell sell the IFS food products through Benevida and to help Harris, Howell and Benevida continue with the theft and misuse of IFS's Intellectual Property, Confidential Information and employees.

65.     Kulhawik and Brent then decided they needed to conceal Conde Nast's and Fremantle's role in the plan.

66.     On January 8, 2014, Kimberly Bernstein, an employee of Conde Nast, moved the regularly scheduled call with IFS to January 13, 2014 to give Conde Nast and Fremantle more time to figure out how best to conceal their role in Harris's and Howell's plan.

67.     On or before January 10, 2014, Kulhawik requested Harris send him and Brent the Dissolution Email, which they would use as justification to terminate the IFS License Agreement, after which they would be able to enter into a similar license agreement with Benevida.  Harris complied with the request and emailed Kulhawik and Brent the Dissolution Email.

68.     After he received the Dissolution Email, Kulhawik informed Harris that he was waiting to hear from Conde Nast's legal department about whether the email would be a sufficient basis for Conde Nast to terminate the IFS License Agreement.

69.     Subsequently, on the same day an after consulting with Kulhawik and Brent regarding the Dissolution Email, Elena Magula, Fremantle's in house legal counsel, emailed Harris and informed him that Fremantle was in receipt of the Dissolution Email, was aware that

13

in December 2013, IFS had requested an extension of time to pay the $250,000.00 marketing fee due Conde Nast, requested that that the $250,000.00 be paid within 30 days (on or before February 9, 2014) and requested Harris forward the email to Inspired and Gary ("Magula's Extension Email"). A copy of Magula's Extension Email is attached as **Exhibit F**.

70.     Harris forwarded Magula's Extension Email to Inspired and Gary the afternoon of January 11, 2014.

71.     Prior to sending her email, and specifically on or before January 8, 2014, Elena Magula, on behalf of Fremantle and Conde Nast had started discussing with Harris and Benevida the things Fremantle and Conde Nast needed so Benevida and not IFS could sell the food products developed and owned by IFS.

72.     Specifically, on January 8, 2014, Elena Magula, in response to an email from Benevida's counsel to her and Brent, emailed Benevida's counsel a punch list of items Conde Nast and Fremantle needed before they would market and promote the sale of the IFS food products via Benevida instead of via IFS. A copy of the punch list email is attached as **Exhibit G.**

73.     Included in Elena Magula's punch list was, *inter alia*, a request for (1) confirmation from Benevida of "[p]roof of assignment from IFS to Benevida of any relevant IP (recipes, patents, trademarks, USDA/FDA permissions, etc.)", (2) proof of insurance in Benevida's name that named Conde Nast as an additional insured, and (3) "copies of any settlement or dissolution agreements" indicating that IFS's members (Inspired, Gary and Harris) agreed to dissolve IFS.

74.     Needless to say, Magula never received from Benevida or anyone (1) proof that

IFS assigned its Intellectual Property to Benevida, (2) proof of insurance, including intellectual property insurance, and (3) settlement or dissolution agreements signed by IFS's members.

75.     Unsurprisingly, despite knowing that Conde Nast and Fremantle were already in the process of working with Benevida for it to distribute IFS's food products, Elena Magula did not, via her Extension Email or otherwise, inform Inspired and Gary or request that Harris inform them that Fremantle and Conde Nast was already discussing with Benevida it deviously selling the food products developed and owned by IFS.  Instead, Elena stayed opportunistically quiet.

76.     On or before January 13, 2014, and after Harris had ample time to secretly transfer to Benevida IFS's Intellectual Property and Confidential Information and Conde Nast and Fremantle had the requisite time to figure out how best to conceal their involvement with Harris's and Howell's scheme, Kulhawik decided it was time to fully pull the rug out from under IFS.

77.     Consequently, on January 13, 2014, Kulhawik emailed Harris a letter immediately terminating the IFS License Agreement and IFS's ability to distribute its food products under Conde Nast's SELF trademark (the "IFS License Termination Letter").

78.     Remarkably, when he sent Harris the IFS License Termination Letter so Harris could send to Inspired and Gary, Kulhawik, like Elena Magula, remained opportunistically quiet and did not inform Inspired and Gary that he knew of and had agreed to have Conde Nast and Fremantle help Harris and Howell with their plan to have Benevida deviously sell the food products developed with IFS's recipes created with the monies Inspired infused into IFS.

79.     Two days after sending the IFS License Termination Letter, Kulhawik, in an

email to Harris at his Gmail address with a carbon copy to Brent, informed Harris that Conde Nast was on board with working with Benevida while the legal issues regarding IFS were worked out and that Conde Nast and Fremantle would continue preparing the public relations campaign and the sales launch of the food products, albeit under Benevida's and not IFS's name. A copy of email is attached as **Exhibit H**.

80.     As a matter of fact, on January 9, 2014, Kulhawik, Brent and others at Conde Nast and Fremantle scheduled and discussed at a January 10, 2014 meeting the public relations campaign that would be required to allow Benevida to successfully distribute and sell IFS's food products.  A copy of the calendar entry for the meeting is attached as **Exhibit I**.

81.     Also, on January 13, 2014 and before Kulhawik sent the IFS License Termination Letter, Conde Nast and Fremantle identified a list of media contacts they needed to target to ensure the successful launch of IFS's food product, albeit, via Benevida and not IFS.

82.     Then on January 31, 2014, 24 days after Benevida was formed, Conde Nast and Fremantle entered into a License Agreement with Benevida ("Benevida License Agreement"), which agreement is similar to the IFS License Agreement.  A copy of the Benevida License Agreement is attached as **Exhibit J**.

83.     Interestingly, before finalizing the Benevida License Agreement, Brent took the time to remind Benevida that it was "benefiting at the start of Y1 from the brand and all of the work CN/SELF team have done to get the product and packaging developed, approved and sold in.  You are also benefiting Y1 from the marketing activations/spend from CN/SELF."

84.     Simply put, Brent reminded Benevida that it was benefiting from the work IFS, Conde Nast and Fremantle did before Benevida was formed at no additional cost to Benevida.

WALLEN HERNANDEZ LEE MARTINEZ, LLP
306 ALCAZAR AVENUE, SUITE 301, CORAL GABLES, FL 33134 • TELEPHONE (305) 842-2100

85.     Blessed with Conde Nast's and Fremantle's approval and support and the Benevida License Agreement, Harris, Howell, and Benevida began selling in January 2014 the food products developed and owned by IFS, which took over 8 months to develop, and began and continued illicitly using IFS's Intellectual Property and Confidential information, including food recipes, meals, product packaging, product label approvals, commercial marketing materials, supplier and client lists, despite a Florida Court entering an injunction prohibiting them from doing so.  A copy of the Florida Court's injunction order is attached as **Exhibit K**.

86.     In particular, and after receiving approval from and with Conde Nast's and Fremantle's support, Harris materially beached the Operating Agreement by, *inter alia*, (1) unilaterally attempting to terminate the Operating Agreement and to improperly dissolve IFS; (2) stealing and intentionally misusing IFS's Intellectual Property, Confidential Information and employees without IFS's written consent; (3) forming, working for and causing Benevida to compete against IFS; and (6) usurping business opportunities of IFS for his and the benefit of the others besides Inspired and Gary (collectively "Harris Rancorous Conduct").

87.     As the CEO of Inspired, Harris held a position of confidence and trust within IFS and owed fiduciary duties and common-law and statutory duties (Florida Statute 605.04091) duties of loyalty, care and good faith to IFS and its members, including, but not limited to the duties to (1) further IFS's interests; (2) not compete with IFS; (3) not disclose, steal and wrongly misuse IFS's Intellectual Property and Confidential Information; (4) not divest IFS's business for his or the benefit of others; and (5) not usurp business opportunities of IFS for his or the benefit of others.

88.     Harris's Rancorous Conduct was also a breach of the fiduciary duties and

17

statutory and common-law duties of loyalty, care and good faith he owed IFS and its members, Inspired and Gary.

## G.   DEMAND FOR ACTION BY HARRIS OR THE MANAGEMENT COMMITTEE WOULD BE FUTILE

89.     Harris effectively resigned from IFS when he sent his Dissolution Email and consequently, forfeited his right to vote on actions to be taken by IFS to protect its interest in its Intellectual Property and Confidential Information, including its decision to pursue this matter.

90.     Nevertheless, based on his actions thus far, a demand on Harris and the Management Committee for IFS to pursue this action would be futile in addition to being unnecessary under Florida law.

## COUNT 1
## BREACH OF CONTRACT
## (AGAINST CONDE NAST AND FREMANTLE)

91.     Plaintiffs incorporate paragraphs 1-91 as though fully set forth herein.

92.     IFS entered into the IFS License Agreement with Conde Nast and Fremantle.

93.     Section 12.8 of the IFS License Agreement, which survived the termination of the agreement, prohibited Conde Nast and Fremantle from using or disclosing IFS's Intellectual Property and Confidential Information outside of the parameters of the IFS License Agreement.

94.     Shortly before Conde Nast terminated the IFS License Agreement, it learned that Harris, Howell and Benevida devised a fraudulent scheme and planned to deviously steal and improperly misuse IFS's Intellectual Property and Confidential Information, but needed Conde Nast's and Fremantle's approval and support to be able to misuse the Intellectual Property and Confidential Information in Benevida's operations.

WALLEN HERNANDEZ LEE MARTINEZ, LLP
306 ALCAZAR AVENUE, SUITE 301, CORAL GABLES, FL 33134 • TELEPHONE (305) 842-2100

95.     Rather than distance itself from the fraudulent scheme devised by Harris and Howell, Conde Nast and Fremantle acquiesced and decided to participate in the scheme, by, *inter alia*, entering into the Benevida License Agreement, which allowed Benevida to improperly misuse IFS's Intellectual Property and Confidential Information.

96.     Conde Nast's and Fremantle's decision to support and enter into the Benevida License Agreement, which allowed Benevida to deviously steal and improperly misuse IFS's Intellectual Property and Confidential Information was a material breach of section 12.8 of the IFS License Agreement.

97.     Plaintiffs suffered damages as a result of Conde Nast's and Fremantle's breach of section 12.8 of the IFS License Agreement, including but not limited to lost profits, the lost value of, and the lost revenue Benevida generated as a result of stealing and improperly misusing IFS's Intellectual Property and Confidential Information.

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and against Conde Nast and Fremantle and award them the economic damages they suffered as a result of Conde Nast's and Fremantle's breach of section 12.8 of the License Agreement, pre and post judgment interest, costs and all other and further relief as appropriate.

## COUNT 2
### AIDING AND ABETTING CALVIN HARRIS'S BREACH OF FIDUCIARY DUTIES AND STATUTORY AND COMMON-LAW DUTIES OWED TO IFS (AGAINST CONDE NAST AND FREMANTLE)

98.     Plaintiffs incorporate paragraphs 1-91 as though fully set forth herein.

99.     As Chief Executive Officer and a managing member of IFS, Harris held a position of confidence and trust and owed fiduciary and common-law and statutory duties of loyalty and

care to IFS and its members, Inspired and Gary.

100.    Harris breached his fiduciary duties and common-law and statutory duties of loyalty, care and good faith by engaging in the Harris Rancorous Conduct.

101.    Conde Nast and Fremantle knew that IFS developed and owned the food recipes and food products.  For example, in early 2013 they attended taste tests and commented on the food products being developed by IFS.  They were aware that the food recipes and products took several months to develop, and thus Benevida did not and could not have developed the food products it was preparing to sell within days of its formation and of entering in the Benevida License Agreement.  As a matter of fact, Conde Nast and Fremantle prepared the Press Kit for the sales launch of the food products, which states that IFS developed and owns the food recipes and food products.

102.    Consequently, Conde Nast and Fremantle knew Harris owed and was breaching his fiduciary and common-law and statutory duties of loyalty, care and good faith to IFS and its members by stealing and misusing via Benevida IFS's Intellectual Property and Confidential Information.

103.    In fact, Elena Magula was so concerned about Harris breaching the duties he owed IFS and its members that she requested, but did not receive from Benevida's counsel, "[p]roof of assignment from IFS to Benevida of any relevant IP (recipes, patents, trademarks, USDA/FDA permissions, etc.)" and proof that Benevida obtained intellectual property insurance that named Conde Nast as an additional insured.

104.    Still, rather than distance themselves from Harris, Conde Nast and Fremantle decided to aid, abet and provide substantial assistance to Harris.  For example, Conde Nast and

Fremantle agreed to provide and did provide Benevida with $2 million dollars worth of marketing dollars and financial and marketing support to launch and selling the food products developed and owned by IFS.

105.     Conde Nast's and Fremantle's actions were a conscious intent to cause Harris to breach the fiduciary duties and common-law and statutory duties of loyalty, care and good faith he owed to IFS and were motivated by their financial greed to reap economic benefits from Benevida's illegal theft and misuse of IFS's Intellectual Property and Confidential information.

106.     As a result of Conde Nast's and Fremantle's nefarious actions, Plaintiffs suffered economic damages, including but not limited to lost profits, the lost value of, and the lost revenue Benevida generated as a result of stealing and improperly misusing IFS's Intellectual Property and Confidential Information.

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and against Conde Nast and Fremantle and award them the economic damages they suffered as a result of Conde Nast's and Fremantle's actions, punitive damages, pre and post judgment interest, costs and all other and further relief as appropriate.

### COUNT 3
### FRAUDULENT CONCEALMENT/OMISSION
### (AGAINST CONDE NAST AND FREMANTLE)

107.     Plaintiffs incorporate paragraphs 1-91 as though fully set forth herein.

108.     IFS, Conde Nast and Fremantle, by virtue of the Deal Memo and IFS License Agreement, have a confidential relationship.

109.     Shortly before Conde Nast terminated the IFS License Agreement, it learned that Harris, Howell and Benevida devised a fraudulent scheme and planned to deviously steal and

improperly misuse IFS's Intellectual Property and Confidential Information, but needed Conde Nast's and Fremantle's approval and support to be able to misuse the Intellectual Property and Confidential Information in Benevida's operations.

110.    Rather than distance themselves from the fraudulent scheme devised by Harris and Howell, Conde Nast and Fremantle acquiesced and decided to participate in the scheme, by, *inter alia*, entering into the Benevida License Agreement and providing to Benevida $2 million dollars worth of annual marketing and financial support, which allowed Benevida to improperly misuse IFS's Intellectual Property and Confidential Information.

111.    Remarkably, before agreeing to assist and participate in the fraudulent scheme devised by Harris and Howell, Conde Nast and Fremantle had several opportunities to inform IFS about the nature of the fraudulent scheme.

112.    Specifically, before Elena Magula sent her Extension Email to Harris to be forwarded to IFS's other members, she knew of the fraudulent scheme.  In fact, she was assisting Benevida to fully implement the scheme by advising Benevida's counsel about the punch list of items Conde Nast and Fremantle needed before they could fully cooperate in the scheme by entering in the Benevida License Agreement and providing Benevida with $2 million dollars of marketing and other support.

113.    Also, before he sent his IFS License Termination Letter, Kulhawik, like Elena Magula, knew of Harris's and Howell's fraudulent scheme because Harris previously explained it to him via a telephone conversation.  Kulhawik, like Elena Magula, also continued assisting Harris, Howell and Benevida to fully implement the scheme by advising Conde Nast's and Fremantle's personnel to continue developing the public relations campaign for the sales launch

WALLEN HERNANDEZ LEE MARTINEZ, LLP
306 ALCAZAR AVENUE, SUITE 301, CORAL GABLES, FL 33134 • TELEPHONE (305) 842-2100

of the IFS's food products.

114.    Despite knowing of Harris's and Howell's fraudulent scheme, Kulhawik and Elena Magula made ambiguous statements to IFS without disclosing their knowledge of the fraudulent scheme to IFS and its other members, Inspired and Gary.  First, Elena Magula sent IFS her Extension Email, which informed IFS that despite the Dissolution Email, it had until February 9, 2014 to pay the royalty payment due Conde Nast under the IFS License Agreement. Then, in a 180-degree turn, Kulhawik sent the IFS License Termination Letter immediately terminating the IFS License Agreement.

115.    Conde Nast and Fremantle intended that IFS and its members would, in reliance on Magula's Extension Email, continue doing business as usual and not discover Harris's and Howell's scheme before Harris could improperly transfer to Benevida IFS's Intellectual Property and Confidential Information.  Also, Conde Nast and Fremantle intended to use Magula's Extension Email to buy more time to figure out how best to conceal their role in Harris' and Howell's scheme.

116.    IFS and its members, as expected, justifiably relied on Magula's email and continued doing business as usual, including, but not limited to, (1) discussing the upcoming sales launch with suppliers and making sure the suppliers were fully prepared to ship the food products, and (2) securing capital to ensure IFS's success in selling the food products.

117.    But, as it turned out, IFS's reliance was misplaced and the opposite was occurring in secret at Benevida, Conde Nast and Fremantle.  Mainly, Harris and Howell were using the extra time provided to them by Magula's Extension Email to take and transfer to Benevida IFS's Intellectual Property and Confidential Information.

WALLEN HERNANDEZ LEE MARTINEZ, LLP
306 ALCAZAR AVENUE, SUITE 301, CORAL GABLES, FL 33134 • TELEPHONE (305) 842-2100

118.     Similarly, Conde Nast and Fremantle were using the extra time provided to them by Magula's Extension Email to plan how best to conceal their involvement in Harris's and Howell's scheme. Conde Nast and Fremantle also used the extra time provided them by Magula's Extension Email to revise their marketing plans to excise references to IFS and to replace them with Benevida, and to prepare and structure the significant marketing and financial support to provide to Benevida so that it could improperly misuse IFS's food products.

119.     Conde Nast and Fremantle, by virtue of the ambiguous statements Kulhawik and Elena Magula made to IFS, owed a duty to disclose to IFS and its members the fraudulent scheme devised by Harris and Howell.

120.     Also, Conde Nast and Fremantle, by virtue of the confidential relationship they had with IFS, owed a duty to disclose to IFS and its members the fraudulent scheme devised by Harris and Howell.

121.     Conde Nast and Fremantle knew IFS and its members were not aware of Harris's and Howell's fraudulent scheme and were acting on the basis of mistaken knowledge, *i.e.* – that based on Magula's Extension Email, Harris's Dissolution Email was of no import and IFS had thirty (30) days to pay Conde Nast and Fremantle the outstanding royalty, after which, IFS could launch its food products under Conde Nast's SELF brand.

122.     Consequently, based on this superior knowledge and the fact that they elected to provide false information to IFS and its members, *i.e.* Magula's Extension Email, Conde Nast and Fremantle owed IFS and its members a duty to disclose Harris's and Howell's fraudulent scheme.

123.     Conde Nast and Fremantle, however, breached the duty to disclose by

WALLEN HERNANDEZ LEE MARTINEZ, LLP
306 ALCAZAR AVENUE, SUITE 301, CORAL GABLES, FL 33134 • TELEPHONE (305) 842-2100

intentionally refusing to disclose the fraudulent scheme to IFS and its members so that they could also share in the economic benefits that came with the launch via Benevida of the IFS's food products.

124.    As a result of Conde Nast's and Fremantle's failure to disclose the fraudulent scheme to IFS and it members, IFS suffered economic damages, including but not limited to the lost profits, the lost value of, and the lost revenue Benevida generated as a result of stealing and improperly misusing IFS's Intellectual Property and Confidential Information.

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and against Conde Nast and Fremantle and award them the economic damages they suffered as a result of Conde Nast's and Fremantle's actions, punitive damages, pre and post judgment interest, costs and all other and further relief as appropriate.

**COUNT 4**
**AIDING AND ABETTING FRAUD**
**(AGAINST CONDE NAST AND FREMANTLE)**

125.    Plaintiffs incorporate paragraphs 1-91 as though fully set forth herein.

126.    Harris and Howell devised the fraudulent scheme described in sections D, E and F, *supra*.

127.    On or about January 7, 2014, Harris informed Kulhawik and Brent of the fraudulent scheme he and Howell devised and sought their assistance in the scheme.

128.    Rather than distance themselves from Harris, Howell and their fraudulent scheme, Conde Nast and Fremantle agreed to keep the scheme secret from IFS and its members.  More significantly, they decided to provide substantial assistance to Harris, Howell and Benevida in connection with the scheme.

129.    In particular, Conde Nast and Fremantle entered into the Benevida License Agreement, pursuant to which they agreed to and provided to Benevida annually $2 million dollars worth of marketing and financial support, which enable Benevida to successfully launch IFS's food products into numerous groceries and other stores.

130.    As a result of Conde Nast's and Fremantle's aiding and abetting Harris's and Howell's fraudulent scheme, IFS suffered economic damages, including but not limited to lost profits, the lost value of, and the lost revenue Benevida generated as a result of stealing and improperly misusing IFS's Intellectual Property and Confidential Information.

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and against Conde Nast and Fremantle and award them the economic damages they suffered as a result of Conde Nast's and Fremantle's actions, punitive damages, pre and post judgment interest, costs and all other and further relief as appropriate.

**COUNT 5**
**CONSPIRACY TO COMMIT FRAUD/FRAUD CONSPIRACY**
**(AGAINST CONDE NAST AND FREMANTLE)**

131.    Plaintiffs incorporate paragraphs 1-91 as though fully set forth herein.

132.    Harris and Howell devised the fraudulent scheme described in sections D, E and F, *supra*.

133.    On or about January 7, 2014, Harris informed Kulhawik and Brent of the fraudulent scheme he and Howell devised and sought their assistance in the scheme.

134.    Rather than distance themselves from Harris, Howell and their fraudulent scheme, Conde Nast and Fremantle agreed to keep the scheme secret from IFS and its members.  More significantly, they agreed to help Harris and Howell achieve the fraudulent scheme and to

provide substantial assistance to Harris, Howell and Benevida in connection with the scheme.

135.    In particular, and in furtherance of their agreement to help Harris and Howell achieve the fraudulent scheme, Conde Nast and Fremantle entered into the Benevida License Agreement, pursuant to which they agreed to and provided to Benevida annually $2 million dollars worth of marketing and financial support, which enable Benevida to successfully launch IFS's food products into numerous groceries and other stores.

136.    As a result of Conde Nast's and Fremantle's conspiring with Harris and Howell in connection with their fraudulent scheme, IFS suffered economic damages, including but not limited to lost profits, the lost value of, and the lost revenue Benevida generated as a result of stealing and improperly misusing IFS's Intellectual Property and Confidential Information.

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and against Conde Nast and Fremantle and award them the economic damages they suffered as a result of Conde Nast's and Fremantle's actions, punitive damages pre and post judgment interest, costs and all other and further relief as appropriate.

### COUNT 6
### MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST CONDE NAST AND FREMANTLE)

137.    Plaintiffs incorporate paragraphs 1-91 as though fully set forth herein.

138.    IFS used the monies it received from Inspired to develop IFS's Intellectual Property and Confidential Information.

139.    IFS took reasonable measures to protect the secrecy of its Intellectual Property and Confidential Information.  For example, IFS required its members, including Harris, to execute the Operating Agreement, which precluded members and others from disclosing or

misusing IFS's Intellectual Property and Confidential Information.

140.    Conde Nast and Fremantle were aware of Harris's duty to maintain the secrecy of IFS's Intellectual Property and Confidential Information.

141.    Like Harris, Conde Nast and Fremantle, via the IFS License Agreement, agreed they would not disclose or misuse IFS's Intellectual Property and Confidential Information.

142.    Despite their obligations to the contrary, Conde Nast and Fremantle misused IFS's Intellectual Property and Confidential Information.   Specifically, they helped Harris intentionally steal and transfer the IFS's Intellectual Property and Confidential Information to Benevida.   Then, they provided over $2 million dollars of marketing and financial support to Benevida so it could market and sell the IFS's food product as its own.   Also, Conde Nast and Fremantle directly promoted the sale of IFS's food products as Benevida's food products when they knew the food products did not belong to Benevida.

143.    As a result of Conde Nast's and Fremantle's conduct, Plaintiffs suffered and continue to suffer irreparable harm and economic damages, including but not limited to lost profits, the lost value of, and the lost revenue Benevida generated as a result of stealing and improperly misusing IFS's Intellectual Property and Confidential Information.

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and against Conde Nast and Fremantle enjoining them from continuing to misappropriate and misuse IFS's trade secrets and confidential information, and awarding Plaintiffs the economic damages they suffered as a result of Conde Nast's and Fremantle's actions, including punitive damages, attorney's fees, pre and post judgment interest, costs and all other and further relief as appropriate.

WALLEN HERNANDEZ LEE MARTINEZ, LLP
306 ALCAZAR AVENUE, SUITE 301, CORAL GABLES, FL 33134 • TELEPHONE (305) 842-2100

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial on all counts, claims and issues which are so triable.

Respectfully submitted,

**ZARIN & ASSOCIATES P.C.**
*Local Counsel for Plaintiffs Inspired Capital, LLC
and Erica Gary, derivatively on behalf of Inspired
Food Solutions, LLC*
One Penn Plaza, Suite 4615
New York, New York 10119
Phone: (212) 580-3131
Facsimile: (212) 580-4393

By:_____s/  Scott Zarin_____
    **Scott Zarin, Esq.**
    scottzarin@copyrightrademarkcounsel.com

- and -

**WALLEN HERNANDEZ
LEE MARTINEZ, LLP**
*Lead Counsel for Plaintiffs Inspired Capital, LLC
and Erica Gary, derivatively on behalf of Inspired
Food Solutions, LLC*
306 Alcazar Ave., Suite 301
Coral Gables, Florida 33134
Phone: (305) 842-2100
Facsimile: (305) 842-2105

By: ____s/  Jermaine A. Lee_____
    **Jermaine A. Lee, Esq.**
    Florida Bar. No.: 0850861
    jlee@whlmlegal.com
    **Arturo Martinez, Esq.**
    Florida Bar No.: 526231
    arturo@whlmlegal.com
    (*Pro hac vice* motions to be submitted)