UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INSPIRED CAPITAL, LLC, and                                        Case No. 18-CV-00712-JFK
ERICA GARY, derivatively on behalf of
INSPIRED FOOD SOLUTIONS, LLC,

Plaintiffs,

   v.

CONDE NAST, an unincorporated division
of Advance Magazine Publishers, Inc., and
FREMANTLEMEDIA NORTH AMERICA, INC.,
a foreign corporation,

Defendants.
_____/

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

**ZARIN & ASSOCIATES P.C.**
*Local Counsel for Plaintiffs Inspired Capital, LLC*
*and Erica Gary, derivatively on behalf of*
*Inspired Food Solutions, LLC*
One Penn Plaza, Suite 4615
New York, New York 10119s
Phone: (212) 580-3131
Facsimile: (212) 580-4393

-and-

**HERNANDEZ LEE MARTINEZ, LLC**
*Lead Counsel for Plaintiffs Inspired Capital, LLC*
*and Erica Gary, derivatively on behalf of Inspired*
*Food Solutions, LLC*
9190 Biscayne Boulevard, Suite 204
Miami Shores, Florida 33138
Phone: (305) 842-2100
Facsimile: (305) 842-2105

# TABLE OF CONTENTS

I.      INTRODUCTION………………………………………………………………   1

II.     ARGUMENT………………………………………………………………..   1

    A.   Plaintiffs Have Sufficiently Alleged IFS's Ownership Of The Licensed
        Goods……………………………………………………………………….   1

        1. Defendants Ignore Plaintiffs' Factual Allegations And IFS's Operating
        Agreement……………………………………………………………………   2

        2.   Defendants Ignore The Parties' Binding Merchandising Deal
        Memo……………………………………………………………………   3

        3.   Defendants' Flawed Reading Of The License Agreement Is
        Unavailing………………………………………………………………...   4

            i.   Defendants' Reading Creates Inconsistencies Within The
            License Agreement. …………………………………………..   5

            ii.   Defendants' Reading Is Inconsistent With The Deal
            Memo…….…………………………………………………   12

            iii.   Defendants' Reading Is Inconsistent With Plaintiffs' Factual
            Allegations…………………………………………...….......   14

    B.  Plaintiffs Have Sufficiently Alleged Defendants' Breach Of The License
        Agreement………………………………………………………………….   14

    C.  Plaintiffs Have Sufficiently Alleged Defendants' Fraudulent Concealment.....   15

            i.  Plaintiffs' Factual Allegations Support A Duty To Disclose..…   15

            ii.   Plaintiffs Have Sufficiently Pled
            Scienter...................................…………………………………   17

            iii.   Plaintiffs Have Sufficiently Pled Justifiable Reliance And
            Damages………………………………………………….......   18

    D.  Plaintiffs Have Sufficiently Alleged Aiding And Abetting Fraud, And Fraud
        Conspiracy………………………………………………………………….   19

    E.  Plaintiffs Have Sufficiently Alleged Aiding And Abetting A Breach Of
        Fiduciary Duty……………………………………………………………….   20

    F.  Plaintiffs Have Sufficiently Alleged Misappropriation Of Trade Secrets……..   22

    G.  Defendants Have Failed To Establish Their Burden Under Rule 19………….   23

III.    CONCLUSION………………………………………………………………...   25

Plaintiffs, Inspired Capital, LLC and Erica Gary, derivatively on behalf of Inspired Food Solutions, LLC ("IFS"), respectfully submit this memorandum in opposition to Defendants Conde Nast and FremantleMedia North America, Inc.'s motions to dismiss.[1]

## I. Introduction

Defendants maintain that Plaintiffs' allegations are insufficient on multiple grounds. However, a review of the motions reveals an effort to dispute, disregard, mischaracterize, not accept, or otherwise provide alternative explanations about Plaintiffs' factual allegations and their reasonable inferences. Since that is impermissible on a Rule 12(b)(6) motion, and Defendants' arguments are otherwise devoid of legal merit, the motions must be denied.

## II. Argument

### A. Plaintiffs Have Sufficiently Alleged IFS's Ownership Of The Licensed Goods.

According to Defendants, "the unambiguous terms of the License Agreement", "other documents", and "common sense establish that IFS does not own the recipes or food products" underlying Plaintiffs' claims, and as such, they must be dismissed. (Defs.' Mem. 8.) However, to arrive at this proposition Defendants willfully disregard the Complaint's factual allegations, as well as the contractual language that supports those allegations. This contravenes the governing principles of review, which require that all of Plaintiffs' factual allegations be taken as true, and that all the attendant reasonable inferences be drawn in Plaintiffs' favor.[2] Considered in accordance with these tenets, the Complaint provides

---

[1]   FreemantleMedia has joined Conde Nast's motion without additional argument. Therefore, this memorandum addresses both motions.

[2]   "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "[W]e draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co*., 648 F.3d 98, 104 (2d Cir. 2011) (quotation marks omitted).

ample support for IFS's ownership of the subject food recipes, as well as the food products embodying the same.  Thus, Defendants' contentions are unavailing.

1.  **Defendants Ignore Plaintiffs' Factual Allegations And IFS's Operating Agreement.**

First, Defendants ignore the factual basis for IFS's ownership of the subject food recipes and products, as specified in the Complaint and reflected in the company's operating agreement attached thereto as Exhibit A ("Operating Agreement").  More specifically, IFS was created in 2012 to develop, manufacture, and distribute lifestyle food brands and products, but lacked the working capital to do so until early in 2013.  (Compl. ¶¶ 15-20.)  This is when IFS was restructured to secure a $500,000 capital infusion, including an initial $100,000 earmarked to secure a marketing and promotion agreement with Defendants so that the IFS-developed and owned food products could be marketed under the "SELF" brand.  (*Id*. ¶¶ 20-23.)

IFS's Operating Agreement, which Defendants conveniently omit from their argument, supports these factual allegations.  (*Id*. Ex. A (D.E. 1-1).)  For instance, the Operating Agreement memorializes the $500,000 capital infusion into IFS, as well as its revamped ownership structure.  (*Id*. at 39.)  More importantly, the Operating Agreement recognizes that IFS owns the intellectual property that encompasses the food recipes and products at issue in the case.  That is, the Operating Agreement defines the term "Intellectual Property" broadly to include:

> [A]ny and all inventions (whether patentable or unpatentable and whether or not reduced to practice), ideas, research and techniques, technical designs, discoveries and specifications, improvements, modifications, adaptations and derivations thereto, [and] trade secrets, know-how and confidential business information and any other information, however documented, that is a trade secret within the meaning of the applicable trade secret protection Laws . . . .

(*Id*. at 5-6.)[3]

The Operating Agreement further specifies that all of the foregoing property, referenced as "*the Company's* Intellectual Property", is IFS's "Confidential Information" that cannot be disclosed unless as otherwise provided therein.  (*Id*. at 34-35 (emphasis added).)

Thus, the food recipes, and the food products embodying the same developed for IFS as stated in Plaintiffs' factual allegations (Compl. ¶ 30), are IFS's intellectual property under any reasonable reading of the Complaint and the corroborating Operating Agreement. This alone conclusively refutes any dismissal attempt premised on the purported absence of factual allegations supportive of IFS's ownership interests.

Again, Defendants impermissibly ignore, or do not accept as true, the factual account of the investment and surrounding effort that gave rise to IFS's development and proprietary interest in the subject food recipes and products.  At a minimum, this factual account supports the conclusion that the stated IFS ownership interests underlying Plaintiffs' claims are plausible, which warrants the rejection of Defendants' contrary arguments.  *See supra* n.2.

## 2.  Defendants Ignore The Parties' Binding Merchandising Deal Memo.

While the referenced factual allegations and the Operating Agreement are enough to overcome Defendants' ownership-based arguments, there is much more.   To illustrate, the ultimate aim of the investment into IFS—*i.e.*, to develop a line of IFS-owned food products that Defendants would then market under Conde Nast's "SELF" brand (Compl. ¶¶ 17, 20)— is further reflected in the Binding Merchandising Deal Memo.   (*Id*. Ex. B (D.E. 1-2).) Defendants also conveniently omit this from their argument.

---

[3]   Food recipes may include trade secrets and patentable components.  *See* U.S. Pat. No. 3,245,800 (describing KFC's patented process of producing fried chicken under pressure without disclosing the makeup of its "moist layer of breading material"—*i.e.*, KFC's secret seasoning).

The Deal Memo is between (1) Conde Nast, as licensor of the "Licensed Property" (*i.e.* the "SELF" brand), (2) FreeMantle, as Conde Nast's representative, and (3) IFS, as licensee of the "SELF" brand to be used on the "Licensed Products" (*i.e.*, "[f]ood products including fresh refrigerated foods, frozen foods, frozen novelties, ice cream and desserts, shelf stable food products, condiments and beverages"). (*Id*. at 1.) More specifically, pursuant to the Deal Memo, IFS was granted an "[e]xclusive and non-transferable right to use the Licensed Property [(*i.e.*, the "SELF" brand)] to produce, distribute, promote and sell the Licensed Products [(*i.e.*, food products, including fresh refrigerated foods, etc.)]" as stated therein. (*Id*.)

Thus, the Deal Memo further supports Plaintiffs' factual account of an investment into IFS for the purpose of its development of a proprietary line of food products and the pursuit of an agreement to market those products using Conde Nast's "SELF" brand. (*Id*. ¶¶ 17, 20.) Defendants' contentions otherwise impermissibly dispute the veracity of Plaintiffs' factual account and the reasonable inferences stemming therefrom. As such, the arguments are inapposite to a determination of whether Plaintiffs have stated plausible claims.

### 3. **Defendants' Flawed Reading Of The License Agreement Is Unavailing.**

Despite the allegations and documents referenced above, Defendants isolate a single term within a single attachment to a single agreement to argue that Plaintiffs do not own the subject recipes and products. More specifically, Defendants reference the parties' License Agreement (Comp. Ex. C (D.E. 1-3 ("Lic. Agrmt."))), and point to its Attachment A to conflate the term "**Licensed Property:**" therein with the provisions that follow it. (Defs.' Mem. 8.) That is, since there is empty space after the colon in the term "**Licensed Property:**", Defendants posit that the terms that follow it constitute and encompass the "Licensed Property". (*Id*.) However, Defendants' nonsensical and strained reading results in: (1) internal inconsistencies within the

4

License Agreement, (2) inconsistencies with the Deal Memo, and (3) a disregard for Plaintiffs' factual allegations and the reasonable inferences stemming therefrom.

**i. Defendants' Reading Creates Inconsistencies Within The License Agreement.**

It is important to first note that, aside from the term "**Licensed Property:**", every other term in bold script throughout Attachment A of the License Agreement is followed, after its respective colon, by terms in non-bold script that specify what each bold term entails. The following are some examples:

**Name and Address of Licensee:**

Inspired Food Solutions
6103 Aqua Ave., Suite 804
Miami Beach, FL 33141

          ***

**Name of Licensor:** Condé Nast, an unincorporated division of Advance Magazine Publishers Inc.

**Authorized Representative of Licensor:**

FremantleMedia North America, Inc.
4000 West Alameda Avenue, Third Floor
Burbank, CA 91505

          ***

**Section 1.1:** Description of Licensed Goods: Food products including fresh refrigerated foods, frozen foods, frozen novelties, ice cream and desserts, shelf stable food products, condiments and beverages.

          ***

**Section 1.1:** Mode of Delivery: High resolution images in digital form on compact disc or via upload to Licensee's FTP site. Any additional assets requested by Licensee shall be at Licensee's sole cost (subject to Licensor and Fremantle and Licensee agreeing said costs in advance).

**Section 1.2:** Distribution Channels: Mass Market Retailers, Grocery Retailers, Club Warehouse, Online Stores, Home Shopping Channel (the specific channels to be approved by Licensor in advance), Drug Stores (including Walgreens, CVS and Rite Aid), Specialty Food chains, and Licensee's and Licensor's direct-to-consumer e-commerce websites. Discount channels are excluded, subject to specific approval of Licensor.

\*\*\*

**Section 12.6:** Incorporated Attachments:
Attachment A
Attachment B
Attachment C
Attachment D
Attachment E
Attachment F
Attachment G

(Lic. Agrmt., Attach. A.)

However, the term "**Licensed Property:**" is followed by empty space:

## Licensed Property:

(*Id*. at 1.) Thus, Attachment A—but not the License Agreement—is silent as to what the term "Licensed Property" means. Defendants' argument is premised on a willingness to disregard this silence—and the explicit definition of "Licensed Property" within the body of the License Agreement—to treat the term "**Licensed Property:**" as a heading that encompasses its following bold terms. (Defs.' Mem. 8.)[4]

---

[4]   This is the reason why Defendants isolate the language in the following manner, suggesting that the terms of "**Section 1.1:**" are subsumed within the term "**Licensed Property:**", and ignoring that "Licensed Property" is already defined in the body of the License Agreement:

**Licensed Property:**

**Section 1.1:**   Description of Licensed Goods: Food products including fresh refrigerated foods, frozen foods, frozen novelties, ice cream and desserts, shelf stable food products, condiments and beverages.

[*Space that would have to be disregarded under Defendants' reading.*]

**First**, Defendants' proposed reading of Attachment A is inconsistent with its structure. As noted, each term in bold script within Attachment A that ends in a colon encompasses, *not* another bold term that ends in a colon as Defendants suggest (*id*.), but a statement in non-bold script of what the bold term entails.  For example, the above-quoted section headings—*e.g.*, "**Section 1.1:**", "**Section 1.2:**", etc.—elaborate on the corresponding numbered sections within the body of the License Agreement where the bold terms are otherwise addressed. *Compare, e.g.,* Lic. Agrmt., Attach. A, § 1.1, *with* Lic. Agrmt., § 1.1.   Thus, the terms "**Licensed Property:**" and "**Section 1.1:**" cannot be conflated nor combined as Defendants posit because this is contrary to how Attachment A is structured within the License Agreement.

**Second**, Defendants' reading is inconsistent with the language of the License Agreement, which already defines "Licensed Property".  That is, the first page of the License Agreement specifies that the term "Licensed Property" means the marks listed in Attachment B (*not* Attachment A):

> WHEREAS, Licensor has the right to license the Trademark(s) listed in Attachment B ("Licensed Property"); and;

(Lic. Agrmt. at 1.)

Thus, while Attachment A is silent as to what the term "**Licensed Property:**" means, the body of the License Agreement is clear in this regard: "Licensed Property" consists of the marks specified in Attachment B.  (*Id*.)  Accordingly, considering the License Agreement as a whole, and not an excerpt thereof in isolation as Defendants propose, it is evident that: (1) the term "**Licensed Property:**" within Attachment A contains an omission following its colon (*i.e.*, it does not reference Attachment B or the marks listed therein), and (2) the omission

is immaterial because the term "Licensed Property" is already defined within the body of the License Agreement, which governs throughout the entire document, including its attachments.[5]

In contrast, there is no analytical support for the proposition that the definition of "Licensed Property" within the body of the License Agreement can be ignored, and that the term "**Licensed Property:**" within Attachment A can be defined otherwise by merging it with the subsequent "**Section:**" provisions as Defendants posit.  (*Supra* n.4.)  Again, each of these "**Section:**" provisions appears in bold script followed by a colon and refers to separate, self-contained sections within the License Agreement.  None of them purports to define the already-defined term "Licensed Property".  Accordingly, the only items included within the term "Licensed Property" are the marks specified in Attachment B to the License Agreement, not any food recipes or products embodying the recipes, which is what Defendants misguidedly suggest.[6]

---

[5]  *See Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (observing, under New York law, that "we do not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by the contract as a whole."); *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995) ("[A] document should be read to give effect to all its provisions and to render them consistent with each other."); *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008) ("The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract."); *Republic of Rwanda v. Ferone*, 307 F. App'x 600, 602 (2d Cir. 2009) ("Courts should construe a contract so as to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract.").

[6]  While Defendants frame their argument in the negative—*e.g.*, "IFS does not own the recipes and food products" (Defs.' Mem. 8)—their proposed interpretation aims to advance Conde Nast's ownership of the items, as they submit that the term "Licensed Goods" is subsumed within the term "Licensed Property", and the License Agreement notes Conde Nast's "exclusive right, title and interest in and to the Licensed Property."  (Lic. Agrmt. § 1.5.)  Thus, what Defendants are really arguing is that Conde Nast owns the "Licensed Goods".

**Third**, Defendants' reading is inconsistent with the overall objective of the License Agreement explicitly outlined in its preamble:

> AGREEMENT, made as of the 1st day of May, 2013, by and between Condé Nast, an unincorporated division of Advance Magazine Publishers Inc. ("Licensor"), with offices at Four Times Square, New York, NY 10036; and Inspired Food Solutions. hereinafter referred to as ("Licensee") with principal offices at 6103 Aqua Ave., Suite 804, Miami Beach, FL 33141.
>
> WITNESSETH:
>
> WHEREAS, Licensor has the right to license the Trademark(s) listed in Attachment B ("Licensed Property"); and;
>
> WHEREAS, FremantleMedia North America, Inc., ("Fremantle"), with offices at 4000 West Alameda Avenue, Third Floor, Burbank, CA 91505 is the authorized representative of Licensor; and
>
> WHEREAS, Licensor, Licensee and Fremantle (together the "Parties") entered into a binding merchandising deal memo signed by the Licensee on March 14, 2013, the Licensor on March 15, 2013 and Fremantle on March 19, 2013 ("Binding Deal Memo"), pursuant to which the Parties agreed that Licensee obtained a license from the Licensor to use the Licensed Property to produce, distribute, promote, and sell the goods now hereinafter defined as Licensed Goods as set forth in Attachment A;
>
> WHEREAS, The Parties now wish to enter into this license agreement, which license agreement shall supersede the Binding Deal Memo, on the terms and conditions outlined herein;
>
> WHEREAS, the Parties desire to safeguard, promote and maintain the reputation and quality enjoyed by Licensor and associated with the Licensed Property and to cause all use of the same by Licensee to inure to the benefit of Licensor:
>
> NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained the parties agree as follows:

(Lic. Agrmt. at 1.)

Thus, the objective of the License Agreement is to set forth the terms under which IFS will be permitted to use Conde Nast's marks, listed in Attachment B (*i.e.*, the "Licensed Property"), as part of IFS's commercial production of the food products defined as "Licensed Goods" (*i.e.*, "Food products including fresh refrigerated foods, frozen foods, frozen novelties, ice cream and desserts, shelf stable food products, condiments and beverages). (*Id*. Attach. A.)

Significantly, however, there is absolutely no statement in the License Agreement supportive of the proposition that Conde Nast has a right to license, or is granting IFS a license to the actual food products to which the marks are being appended. To the contrary, Section 1.5 of the License Agreement states that what Conde Nast has is the "exclusive right, title and interest in and to the Licensed Property," which again, is circumscribed to the marks specified in Attachment B—*not* Attachment A—to the License Agreement. (*Id*. § 1.5.) Consistent with that language, Section 1.2 of the License Agreement states that Conde Nast is granting IFS "an exclusive, non-transferable license . . . to use the Licensed Property solely for the purpose of manufacturing, distributing, promoting and selling Licensed Goods . . . ." (*Id*. § 1.2.)

Accordingly, Defendants' proposition is inconsistent with the express objective of the parties' contractual relationship evinced in the License Agreement. That is, the License Agreement presupposes that IFS can ascertain how to make, and has a right to make, the food products defined as the "Licensed Goods". This is because Conde Nast is not transferring any knowhow regarding the products' confection, nor any license to confect the same. Instead, what the License Agreement grants IFS is a license to use Conde Nast's "SELF" marks, defined as "Licensed Property", in the production and sale of the products. (*Id*.) None of the License Agreement's statements in this regard make any sense if, as Defendants propose, the term "Licensed Property" includes "Licensed Goods".

For instance, if the "Licensed Goods" are "Licensed Property", the statement that "[Conde Nast] grants [IFS] an exclusive . . . license . . . to use the Licensed Property solely for the purpose of manufacturing, distributing, promoting and selling Licensed Goods" (Lic. Agrmt. § 1.2) is nonsensically redundant, inasmuch as the term "Licensed Property" would already encompass "Licensed Goods".

10

The statement would also be irreconcilable with the License Agreement's preamble, which specifies in its first "Whereas" clause that the term "Licensed Property" consists of "the Trademark(s) listed in Attachment B".  (Lic. Agrmt. at 1.)  Indeed, that is the *entire extent* of the property that Conde Nast states it has a right to license.  (*Id*. ("WHEREAS, [Conde Nast] has the right to license "the Trademark(s) listed in Attachment B").)

This is further supported by the final "Whereas" clause, which confirms that the "Licensed Property" being licensed (*i.e.*, the "SELF" marks) *already exists*, as it has a reputation and quality to be maintained.  (Lic. Agrmt. at 1 ("[T]he parties desire to safeguard, promote and maintain the reputation and quality enjoyed by Licensor and associated with the Licensed Property and to cause all use of the same by Licensee to inure to the benefit of Licensor.").)[7]

This completely negates Defendants' contention that the License Agreement was meant to *develop* a subset of "Licensed Property"—*i.e.*, "Licensed Goods"—for the benefit of Conde Nast.  (Defs' Mem. 9-10.)  Stated otherwise, if the "Licensed Goods" had not yet been created at the time of the License Agreement, they cannot be "Licensed Property", inasmuch as they could not have resulted in any reputation and quality enjoyed by Conde Nast.  Thus, the only interpretation of "Licensed Property" consistent with the objective of protecting a preexisting reputation and quality is that the term means the marks listed in Attachment B of the

---

[7]  As stated in the first page of the Deal Memo, the "SELF" marks that constitute the "Licensed Property" have been a part of "SELF" magazine:

| Licensed Property | The title, logo, graphics, trademarks and trade dress contained in or derived from the magazine entitled "SELF", as further outlined in Exhibit A hereto. |
|---|---|

This is the reason why, as is standard in brand licensing agreements, Conde Nast retained rights of: (1) quality control and approval of the "Licensed Goods" in which the "Licensed Property"—*i.e.*, the "SELF" marks—would be used (Lic. Agrmt. § 2.4 (referencing "SELF" magazine)), and (2) the intellectual property that the marks and their development represent.  (*Id.* §§ 1.5, 2.3.)  Thus, Defendants' effort to explain these provisions in their favor (Defs.' Mem. 9-10) is unpersuasive.

License Agreement.  Again, that is what the first "Whereas" clause expressly states.  (Lic. Agrmt. at 1.)

Finally, Defendants posit that the License Agreement's termination provision (§ 11.2.1) supports their position by precluding the sale of "Licensed Goods" after termination. (Defs' Mem. 9-10.)  However, there is nothing in the definition of "Licensed Goods" (Lic. Agrmt. Attach. A at 1)), or in the termination provision, that includes the intellectual property underlying the "Licensed Goods", including their recipes and confection methods. Thus, contrary to what Defendants contend, IFS retained all ownership, development and transfer rights to that intellectual property.  This means that Defendants' related contention, that Plaintiffs cannot establish damages (Defs.' Mem. 12), is absolutely without merit.  Irrespective of whether IFS would itself be prohibited from selling the Licensed Goods, it would not be prohibited from:  (1) licensing the intellectual property rights to the same, or (2) recovering from those using that intellectual property to sell Licensed Goods without IFS's authority to do so.

In sum, a review of the License Agreement reveals that Defendants' proposed reading cannot be reconciled with its objectives, as reflected in its pertinent provisions.  Defendants' arguments otherwise, based on cursory assertions about contractual language that they pluck out-of-context and in isolation, are without merit.

### ii.  Defendants' Reading Is Inconsistent With The Deal Memo.

"Under New York law, all writings forming part of a single transaction are to be read together."  *This Is Me v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (adding that this is true "even though they were executed on different dates and were not all between the same parties."); *accord Kelso Enters. v. A.P. Moller-Maersk A/S*, 375 F. App'x 48, 49 (2d Cir. 2010) ("[W]hen interpreting a contract or multiple contracts in a transaction, we strive to give effect to all of the

terms of the relevant documents, reading them together."); *see also In re Residential Cap., LLC*, 533 B.R. 379, 397-98 (Bankr. S.D.N.Y. 2015) ("Although New York law gives full effect to merger clauses and extinguishes a previous agreement if the merger clause expressly states that the new (or later dated) agreement supersedes the previous agreement, a merger clause may be overcome when the contracts are executed by the same parties and for the same purpose and the parties' intent would be promoted rather than undermined.") (quotation marks, brackets and citations omitted).

Here, Defendants' reading of the term "Licensed Property" is not only inconsistent with how that term is defined within the body of the License Agreement (as noted above), but it is inconsistent with how the term is defined in the Deal Memo. Specifically, much like the body of the License Agreement, the Deal Memo provides:

| Licensed Property | The title, logo, graphics, trademarks and trade dress contained in or derived from the magazine entitled "SELF", as further outlined in Exhibit A hereto. |
|---|---|

(Compl. Ex. B (D.E. 1-2) at 1; *accord* Lic. Agrmt. at 1 (defining "Licensed Property" as "the Trademark(s) listed in Attachment B" depicting "SELF").)

Similarly, consistent with how the term "Licensed Goods" is defined within Attachment A of the License Agreement, the Deal Memo provides:

| Licensed Products | Food products including fresh refrigerated foods, frozen foods, frozen novelties, ice cream and desserts, shelf stable food products, condiments and beverages. |
|---|---|

(*Id.*; *accord* Lic. Agrmt. Attach. A at 1 ("Description of Licensed Goods: Food products including fresh refrigerated foods, frozen foods, frozen novelties, ice cream and desserts, shelf stable food products, condiments and beverages.").)

Thus, considering how "Licensed Property" is defined in the Deal Memo *and* in the body of the License Agreement, Defendants' strained reading of the term is untenable. Simply,

Defendants' position—that "Licensed Property" subsumes "Licensed Goods"—is belied by the conforming terms of the Deal Memo and the License Agreement. They confirm that "Licensed Property" refers *only* to Conde Nast' "SELF" marks. (Lic. Agrmt. at 1 (defining "Licensed Property" as "the Trademark(s) listed in Attachment B" depicting "SELF"); *accord* Compl. Ex. B (D.E. 1-2) at 1 (referring to the same "SELF" marks).)

### iii.  Defendants' Reading Is Inconsistent With Plaintiffs' Factual Allegations.

As noted, a 12(b)(6) review requires the acceptance of a plaintiff's factual allegations, with all reasonable inferences drawn in its favor. *Supra* n.2. That mandate cannot be observed in this case if Defendants' proposed reading of the term "Licensed Property" is accepted.

To illustrate, Plaintiffs have alleged the fact of a $500,000 capital investment into IFS to, *inter alia*, fund the development of the subject recipes and products. (Compl. ¶¶ 2, 15-22, 30.) In addition, Plaintiffs have alleged the fact of Defendants' communications in furtherance of the Benevida deal, including a specific email acknowledging the need to obtain proof of assignment of IFS's relevant intellectual property (including recipes) before the deal could proceed. (*Id.* ¶¶ 60-62, 66-73, Ex. G.) The reasonable inference to be drawn from these allegations is that, indeed, IFS had acquired proprietary rights into what Defendants now disingenuously contend is theirs. (*Supra* n.6.) Thus, Defendants' arcane reading should be rejected for the additional reason that it contravenes Plaintiffs' factual account, which provides a contextual basis for the reasonable inferences of ownership that must be drawn in their favor as a matter of law.

### B.  Plaintiffs Have Sufficiently Alleged Defendants' Breach Of The License Agreement.

Defendants argue that Plaintiffs have not alleged a breach of the License Agreement's confidentiality provision (§ 12.8), contending that the Complaint does not aver they acquired or learned information about IFS's business and operations, or that they disclosed or used the same.

(Defs.' Mem. 13.)  Again, Defendants ignore the factual allegations and reasonable inferences.

More specifically, during their interactions with IFS, Defendants acquired intimate knowledge about IFS's confidential business plans, including its plans to market frozen food products under Conde Nast's "SELF" brand, as well as the confidential terms of their License Agreement with IFS, which reflected the financial structure that IFS had negotiated based on its own projections for the project.  (Compl. ¶¶ 17, 20, 30-39.)  The License Agreement prohibits any "use" of that information.  (Lic. Agrmt. § 12.8.)  Yet, Defendants disregarded that prohibition and breached the same when they used the very concept that IFS came up with—*i.e.*, a line of frozen food products to be sold under the "SELF" brand—to enter into substantially the same license agreement with a different company, Benevida Foods, LLC.  (*Id.* ¶¶ 82, 93-97.)  In this regard, Defendants' efforts to blame others (Defs.' Mem. 13) is unavailing.  It is Defendants who were contractually prohibited from any "use" of the ideas and business information that IFS developed—*i.e.*, information relating to [IFS's] business and operations . . . which is not commonly or currently known in the marketplace (Lic. Agrmt. § 12.8).  However, Defendants freely used that information in crafting the Benevida deal.  Thus, their dismissal argument on the breach of contract claim is also without merit.

## C.  Plaintiffs Have Sufficiently Alleged Defendants' Fraudulent Concealment.

### i.  Plaintiffs' Factual Allegations Support A Duty To Disclose.

Defendants submit that Plaintiffs' fraudulent concealment claim is deficient because they did not have a duty to disclose material facts to IFS.  (Defs.' Mem. 14.)  But once again, the argument is premised on a willingness to disregard the truth of Plaintiffs' factual allegations and their reasonable inferences.

First, contrary to what Defendants submit, a fiduciary relationship is not a necessary component of a duty to disclose.  A confidential relationship, like the one that existed between the parties herein given their mutual access to each other's sensitive business information (Lic. Agrmt. § 12.8), is also among the circumstances giving rise to a duty to disclose.[8]  Thus, Defendants' initial contention is without merit; a duty to disclose existed based on the parties' confidential relationship.  (Compl. ¶¶ 34, 108; Lic. Agrmt. § 12.8.)

Moreover, a duty to disclose also existed based on Defendants' superior knowledge that Harris had in fact created and was acting on behalf of a new entity, Benevida, *not* IFS, to undermine IFS's License Agreement with Defendants, and procure a substantially similar agreement for Benevida using IFS's intellectual property.   (*Id.* ¶¶  59-75,  109-123.)  And contrary to Defendants' argumentative refusal to accept the truth of Plaintiffs' factual allegations regarding their knowledge of, and participation in, Harris's plan (*id.*), those allegations, and their reasonable inferences, must be accepted at this stage of the proceedings.[9]

---

[8]  *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ("New York recognizes a duty by a party to a business transaction to speak in three situations:  first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary *or confidential relationship with each other*; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.") (emphasis added) (quotation marks and citations omitted).

[9]  Defendants repeatedly suggest that:  (a) given Harris's position within IFS, IFS must have known what Harris was doing, and (b) they were justified in acting in conformance with that knowledge.  (*E.g.*, Defs.' Mem. at 15.)  This is without merit, not only because it seeks to draw impermissible inferences against Plaintiffs on a 12(b)(6) motion (*supra* n.2), but because as a matter of law, knowledge of Harris's scheme against IFS cannot be imputed to IFS.  *See Ctr. v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985) ("[W]hen an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose.") (citations omitted).

Lastly, a duty to disclose also existed as a result of Defendants' "partial or ambiguous statement[s]" to IFS (*Brass*, 987 F.2d at 150), which variously represented that IFS had an additional thirty days to make an overdue royalty payment, then a few days later informed that the License Agreement was being terminated for failure to make said payment, all while failing to mention that contemporaneously, Defendants were involved with Harris in the process of crafting the Benevida deal.  (Compl. ¶¶ 67-78, 112-119.)  Thus, Defendants' various statements were "ambiguous", and at the very least only "partial" (*Brass*, 987 F.2d at 150), about the then state of the affairs, especially since they knew that Harris was working for Benevida and against IFS's interests.   Accordingly, Defendants' position of convenience—*i.e.*, that IFS was kept informed via Harris (Defs.' Mem. 15)—is unpersuasive.  *Supra* n.9.  In short, Plaintiffs' factual allegations support multiple sources for the duty-to-disclose component of the fraudulent concealment claim against Defendants:  (1) the parties' confidential relationship, (2) Defendants' superior knowledge that Harris was acting for Benevida and against IFS, and (3) Defendants' ambiguous and/or incomplete statements that failed to inform about Harris's conduct for Benevida.

### ii.  Plaintiffs Have Sufficiently Pled Scienter.

Defendants also purport to challenge the sufficiency of Plaintiffs' allegations of scienter.  (Defs.' Mem. 16.)   However, a closer inspection reveals that what Defendants advance is a challenge to the truth of Plaintiffs' factual allegations.

For instance, Defendants submit that the allegations do not support their awareness of the asserted fraudulent scheme, or their knowledge that IFS was unaware of Harris's plans.  (*Id.*) However, as discussed immediately above, this is exactly what Plaintiffs' factual allegations address when they detail Defendants' knowledge of Harris's creation of a new entity acting in

contravention of IFS's interests, and Defendants' involvement in the effort to replace IFS as licensee with Benevida. (Compl. ¶¶ 59-62, 66-73, Ex. G.) And no, Defendants did not openly contract with Benevida as they contend. Rather, the factual allegation is that they hid the entire process from IFS. (*Id*. ¶¶ 66-82.) Thus, Defendants' contentions amount to nothing more than an unwillingness to take Plaintiffs' allegations as true.

Similarly, Defendants' next contention, that no motive for replacing IFS with Benevida is identified (Defs.' Mem. 16), willfully ignores the Complaint's entire factual account. Simply, despite an existing contractual relationship with IFS, Defendants sought to sabotage that relationship to, as their current contentions confirm (*supra* n.6), manufacture a premise under which they could assert ownership of the Licensed Goods.

### iii. Plaintiffs Have Sufficiently Pled Justifiable Reliance And Damages.

Defendants' contention that reliance and damages are not sufficiently alleged is also premised on a refusal to accept the truth of Plaintiffs' factual allegations. For instance, Defendants aim to dispute that IFS could have relied on their January 10, 2014 representation that IFS had an additional thirty days to make a royalty payment, such that IFS proceeded with business as usual. (Defs.' Mem. 17.) In this regard, Defendants posit that Harris was "the only person authorized to carry on the business of IFS". (*Id*.) However, there is no support for this contrived proposition, whose materiality to the argument is unintelligible in the first place.

On the other hand, reliance and resulting damages are sufficiently alleged. As noted, they are not only premised on Defendants' affirmative representations that lulled IFS into a belief that it had additional time to make the outstanding royalty payment, but also on Defendants' failure to promptly disclose their ongoing dealings with Harris—while the License Agreement was still in place—to misappropriate IFS's property and craft a substitute deal with

Benevida.  (Compl. ¶¶ 56-78, 112-121.)  As a result, IFS was unable to take timely protective measures to protect its property and interest in the License Agreement.  (*Id*. ¶¶ 115-117, 121.) Defendants' effort to discredit Plaintiffs' allegations, and to characterize them otherwise, is nothing more than an impermissible challenge to the governing principles of a 12(b)(6) review.

**D.** **Plaintiffs Have Sufficiently Alleged Aiding And Abetting Fraud, And Fraud Conspiracy.**

Defendants also argue that the claims for aiding and abetting fraud, and conspiracy to commit fraud, lack facts supportive of: (a) the underlying fraud (Defs.' Mem. 18-19), or (b) Defendants' knowledge or substantial assistance in the fraud.  (*Id*. 19-20.)  However, yet again, Defendants' argument is based on their facile disregard for Plaintiffs' factual allegations, and their unwillingness to accept the truth of those allegations and their reasonable inferences.

For instance, Defendants premise their argument on the absence of *affirmative misrepresentations* involving Harris (*id*. at 18-19), knowing full well that Harris's fraudulent conduct involved the *concealment* of his actions against IFS's interests.  That is, despite being bound by a fiduciary duty towards IFS, Harris acted against its interests, concealing that he had formed Benevida with an objective directly antagonistic to IFS—*i.e.*, replace IFS in a license agreement with Defendants—and that, while the License Agreement was still in place, he was actively pursuing that objective using IFS's property and personnel. (Compl. ¶¶ 54-88.)

Moreover, as previously discussed, Defendants had actual knowledge of this conduct because *they participated* in the concealment.  (*Id*. ¶¶ 59-62, 66-82, Ex. G.)  In this regard, Defendants were fully aware that Harris was acting for Benevida (and consequently, not for

19

IFS), and that Benevida lacked the authority to use IFS's intellectual property.  (*Id*.)  Yet, they did not inform IFS.  Thus, Defendants provided substantial assistance by: (1) pursuing the Benevida deal with Harris while the License Agreement was still in place, and (2) concealing their dealings with Harris in furtherance of that deal.  Defendants' contrary contentions consist of nothing more than: (a) an impermissible challenge to the veracity of Plaintiffs' factual allegations, and (b) an equally impermissible effort to inject explanatory inferences drawn in their favor.

### E.  Plaintiffs Have Sufficiently Alleged Aiding And Abetting A Breach Of Fiduciary Duty.

Defendants contend that the aiding and abetting a breach of fiduciary duty claim is time barred because Harris's *initial* breach occurred more than three years prior to filing. (Defs.' Mem. 19-20.)  However, under New York law:

> If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff, or, if the plaintiff dies, and the cause of action survives, his or her executor or administrator, may commence a new action upon the same transaction or occurrence or series of transactions or occurrences *within six months after the termination* provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

CPLR 205(a) (emphasis added).

In other words, this action and all its claims are timely because Plaintiffs' Florida suit against Defendants terminated for purposes of CPLR 205(a) when the appellate court issued its mandate on September 22, 2017 (Neidl Decl. Ex. 8), and Plaintiffs filed and served this action within six months therefrom, on January 26, 2018 (D.E. 1), and February 15, 2018,[10] respectively.  *See Malay v City of Syracuse*, 33 N.E.3d 1270, 1273 (N.Y. 2015) ("[W]here an

---

[10]  Defendants accepted service on February 15, 2018.

appeal is taken as of right, the prior action terminates for purposes of CPLR 205 (a) when the nondiscretionary appeal is truly 'exhausted,' either by a determination on the merits or by dismissal of the appeal . . . .").

CPLR 205(a) applies even if the prior action was pending in another state. *See Lehman Bros. v. Hughes Hubbard & Reed, L.L.P.*, 707 N.E.2d 433, 434 (N.Y. 1998) ("[T]he prior action was terminated within the meaning of CPLR 205 (a) as of June 1, 1995, the date plaintiff's sole nondiscretionary Texas appeal was exhausted.  The statutory six-month period began to run at that time."); *accord Malay*, 33 N.E.3d at 1272-73 (explaining this *Lehman* holding with approval).  Thus, Defendants' proposition is without merit.

Separately, Benevida's contractual relationship with Defendants, and Harris's fiduciary duty breaches against IFS thereunder, continued until at least April of 2015.  (*See* S.D.N.Y. Case No. 15-cv-02729, D.E. 17 at 3 (joint pretrial statement of material uncontested or admitted facts between Benevida Foods, LLC and Advance Magazine Publishers, Inc., d/b/a Conde Nast, acknowledging that their relationship continued through April 1, 2015, when Benevida sent a termination letter to Conde Nast).)[11]

Thus, under the continuing wrong doctrine, the claim cannot be dismissed as untimely, especially because given the admissions in the foregoing filing, Defendants have not satisfied their burden to show that Harris's breaches ceased prior to three years before the filing of this action.  *See Palmeri v. Willkie Farr & Gallagher LLP*, 69 N.Y.S.3d 267, 271 (N.Y. App. Div. 2017) ("[P]laintiff alleges not only that defendant breached its fiduciary duty when it terminated its professional relationship with him, but also when, until at least June 2011, it acted in a

---

[11] "In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice.*"  *Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 349 n.6 (S.D.N.Y. 2012) (quotation marks omitted).

manner directly adverse to his interests.  Where there is a series of continuing wrongs, the continuing wrong doctrine tolls the limitation period until the date of the commission of the last wrongful act.  Here, plaintiff has presented evidence of a continuing wrong, which is deemed to have accrued on the date of the last wrongful act.") (quotation marks and citations omitted); *see also Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013) ("[B]ecause the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run.").

Defendants' alternative dismissal argument has already been refuted.  That is, Defendants insist that they dealt with Harris while he was IFS's CEO and majority owner (thus acknowledging the source of his fiduciary duties), and that thus, there are no allegations supportive of their actual knowledge of his breaches.  (Defs.' Mem. 21.)  As previously explained, this argument is premised on a refusal to accept the truth of Plaintiffs' allegations, which detail how Defendants learned of Harris's involvement in Benevida in contravention of IFS's interests in the License Agreement with them.  (Compl. ¶¶ 59-62, 66-73.).  Thus, Defendants' claimed ignorance is still unavailing.

**F.  Plaintiffs Have Sufficiently Alleged Misappropriation Of Trade Secrets.**

Defendants argue that Plaintiffs' misappropriation of trade secrets claim is also barred under the three-year statute of limitations.  (Defs.' Mem. 22.)  As noted before, CPLR 205(a) is dispositive of Defendants' limitations arguments.  Furthermore, as explained in *Lemelson v. Carolina Enters.*, 541 F. Supp. 645 (S.D.N.Y. 1982):

> In New York, the rule may be stated as follows.  If a defendant misappropriates and discloses a trade secret, he becomes liable to plaintiff upon disclosure.  On the other hand, if the defendant keeps the secret confidential, yet makes use of it to his own commercial advantage, each successive use constitutes a new, actionable

tort for the purpose of the running of the Statute of Limitations.

*Id*. at 659.

Here, there is no record that can be considered on a 12(b)(6) motion revealing if and when Defendants disclosed IFS's trade secrets—*i.e.*, the recipes and knowhow underlying the subject food products.  Rather, as noted above, the allegations and properly reviewable records only reflect Defendants taking commercial advantage of the trade secrets through April of 2015.  Thus, Defendants have not satisfied their burden on a statute of limitations defense.[12]

Next, Defendants contend that Plaintiffs have not identified a trade secret that IFS owns.  (Defs.' Mem. 22.)  However, as previously discussed, Plaintiffs have sufficiently alleged IFS's ownership of the intellectual property at issue, including trade secrets encompassed in the subject food recipes, as confirmed by the Operating Agreement.  (*Supra* § A.1; Compl. ¶¶ 2, 28.)

Defendants also contend that they are not alleged to have used trade secrets, which is meritless.  (Defs.' Mem. 22.)  They are not shielded from liability merely because their access to and use of the trade secrets was with the assistance of its licensee, Benevida.  (Compl. ¶¶ 62, 85.)

## G.  Defendants Have Failed To Establish Their Burden Under Rule 19.

Finally, Defendants cursorily posit that the Complaint must be dismissed, or the action stayed, because Harris and Howell are necessary and indispensable parties that must be joined.  (Defs.' Mem. 23-24.)  However, Defendants' request is unsupported, and since they cannot remedy this with new argument offered for the first time in a reply, it must be summarily rejected.  *See Barclays Cap. Inc. v. Theflyonthewall.com*, 700 F. Supp. 2d 310, 352 n.12

---

[12]   Defendants cite *VoiceOne* (2014 WL 10936546), in which the court stated that "where the plaintiff had knowledge of the defendant's misappropriation and use of its trade secret, the continuing tort doctrine does not apply."  *Id*. at *10 (quoting *Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08-3669, 2009 WL 2016872, at *2 (S.D.N.Y. July 9, 2009)).  However, the ruling that the *Synergetics* court cited for that proposition does not support the statement.  *See M & T Chems., Inc. v. IBM*, 403 F. Supp. 1145, 1150 (S.D.N.Y. 1975).

(S.D.N.Y. 2010) ("Arguments raised for the first time in a reply may not be considered when the opposing party is deprived of the opportunity to be heard as to that issue.")[13]

First, Defendants' statement, that a resolution of the recipes' ownership is "a point of dispute in the Florida litigation" vis-à-vis Harris and Howell (*id*. 23), is devoid of any basis or explanation.  It is Defendants' burden to show that Harris and/or Howell have not just any interest, but a legally protected interest in the subject matter of this action, and there is no support for the proposition that either individual claims or has any ownership interest, let alone a legally protected one, in the subject recipes, or that such an interest would be impaired if either individual is not joined herein.  *See Lovell v. GEICO Gen. Ins. Co.*, No. 12-00546V, 2016 WL 3892868, at *3 (W.D.N.Y. July 13, 2016) ("[F]or a person or entity to be a necessary party under Rule 19(a)(1)(B), the person or entity must have a legally protected interest in the subject matter of the litigation.  The interest must be legally protected, not merely a financial interest or interest of convenience.  Stated another way, the absentee must have a direct stake in the pending litigation.") (quotation marks and citations omitted).

Furthermore, contrary to what Defendants contend, there is no need for Harris or Howell to be joined as parties for there to be a determination of whether they engaged in any alleged

---

[13] "Fed. R. Civ. P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party.  First, the court must determine whether an absent party belongs in the suit, *i.e.*, whether the party qualifies as a 'necessary' party under Rule 19(a)."  *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 493 (S.D.N.Y. 2002) (quotation marks and citation omitted).  "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)."  *Id*. at 494 (quotation marks and citation omitted).  "But where the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must finally determine whether the party is 'indispensable.'"  *Id*. (quotation marks, ellipsis and citation omitted).  "The moving party has the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence."  *Id*. at 495 (quotation marks and citation omitted).

conduct.  This is because a resolution of those factual issues would not be binding upon them, or impact their rights in the Florida litigation in any manner.  Simply, Defendants' statements, that the claims here "will necessarily require the Court to make a threshold determination of regarding [sic] the liability of Harris and Howell", or that they could be "expose[d]" to "inconsistent determinations",[14] (Defs.' Mem. 24) is unsupported and unsupportable.  There is no such "exposure" to "liability", and in any event, Defendants have not demonstrated any such "exposure", which again, is their burden that cannot be satisfied via a reply.  Accordingly, Defendants have not shown that Harris and/or Howell are necessary parties under Rule 19(a).

Moreover, although Defendants have fatally failed to offer any indispensable party analysis under Rule 19(b) (*supra* n.13), the record reflects that Harris and Howell are not subject to personal jurisdiction in this Court.  (Neidl Decl. Ex. 1 ¶¶ 9-10.)  And although neither individual is "necessary", much less "indispensable" (*Lovell*, 2016 WL 3892868, at *5), it would be contrary to justice to dismiss or stay this action to Plaintiffs' prejudice (*id.*), especially where Defendants were previously parties to the Florida suit along with Harris and Howell, and successfully argued that they should be sued here.  The Court should not countenance such inconsistent positions.

### III.  Conclusion

Plaintiffs have pled properly supported plausible claims for relief on each of the counts, and Defendants' motions must be denied in their entirety.  Moreover, any dismissal should be with leave to amend.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that leave to amend is to be freely given in the absence of undue delay, bad faith, undue prejudice, futility, or repeated failures to cure deficiencies).

---

[14]  Rule 19's "inconsistent obligations" provision pertains to the existing parties, not those that purportedly need to be joined. Fed. R. Civ. P. 19(a)(1)(B)(ii).  Thus, the contention is inapposite.

25

Dated: May 11, 2018.                    **ZARIN & ASSOCIATES P.C.**

*Local Counsel for Plaintiffs Inspired Capital, LLC
and Erica Gary, derivatively on behalf of
Inspired Food Solutions, LLC*
One Penn Plaza, Suite 4615
New York, New York 10119s
Phone: (212) 580-3131
Facsimile: (212) 580-4393

By: */s Scott Zarin*
    **Scott Zarin, Esq.**
    scottzarin@copyrighttrademarkcounsel.com

    -and-

    **HERNANDEZ LEE MARTINEZ, LLC**
    *Lead Counsel for Plaintiffs Inspired Capital, LLC
    and Erica Gary, derivatively on behalf of Inspired
    Food Solutions, LLC*
    9190 Biscayne Boulevard, Suite 204
    Miami Shores, Florida 33138
    Phone: (305) 842-2100
    Facsimile: (305) 842-2105

    By: */s Jermaine A. Lee*
    **Jermaine A. Lee, Esq.**
    Florida Bar. No.: 0850861
    jlee@whlmlegal.com
    **Arturo Martinez, Esq.**
    Florida Bar No.: 526231
    arturo@hlmlegal.com
    (*Pro hac vice* motions to be submitted)